1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11  KAREN LaMANTIA,
                                          NO. CIV. S-01-1933 LKK/GGH
12          Plaintiff,

13      v.                                       O R D E R

14  VOLUNTARY PLAN ADMINISTRATORS
    INC., et al.,
15
            Defendants.
16  _____/

17      Plaintiff, Karen Lamantia ("plaintiff"), filed this action

18  against Hewlett-Packard Company Employee Benefits Organization

19  pursuant to the Employee Retirement Income Security Act ("ERISA")

20  to recover benefits provided under an employee income protection

21  plan.  This matter comes before the court on cross-motions for

22  summary judgment.  I decide the motions based on the papers and

23  pleadings filed herein and after oral argument.

24  ////

25  ////

26  ////

                                    1

# I.

## FACTUAL BACKGROUND[1]

**A.  THE PLAN**

Plaintiff, who held a full-time position as Account Representative in Hewlett-Packard's Customer Support department, was a member of the Hewlett-Packard Company Employee Benefits Organization Income Protection Plan ("Plan").  The Plan was adopted by Hewlett-Packard Company ("HP") to provide its employees with income in the event of certain disabilities.  HP sponsors the plan through the Hewlett-Packard Company Employee Benefits Organization ("the Organization").  The Plan is self-funded by HP, rather than insured through an insurance company, and is administered pursuant to the Administrative Services Contract it has with Voluntary Plan Administrators, Inc. ("VPA"), which acts as the claim administrator for the Plan.

For VPA to approve a claim for Plan benefits, a member must establish that he or she is "Totally Disabled" as defined under the Plan.  Def's Ex. E at HP00354-00355.  The requirements for Total Disability vary, depending upon whether the member seeks short or long term disability benefits.  Where the member seeks short-term disability ("STD") benefits, Total Disability means that, "following the onset of injury or sickness, the member is continuously unable to perform each and every duty of his or her Usual Occupation."  A member's Usual Occupation is defined as the normal work assigned to the member by HP.  Def's Ex. E at

---

[1] Unless otherwise noted, these facts are undisputed.

1  HP00358.  The Plan also provides that a member must be under the

2  care of a licensed physician and be examined at a frequency

3  consistent with the Member's condition.  Def's Ex. E at HP00355.

4  If a member qualifies, the member is entitled to up to a maximum

5  of 39 weeks of STD benefits.

6       By contrast, after the initial 39 week period, where a

7  member seeks long-term disability ("LTD") benefits, Total

8  Disability means that, "the Member is continuously unable to

9  perform any occupation for which he or she is or may become

10 qualified by reason of his or her education, training or

11 experience."  Def's Ex. E at HP00355.  Certain conditions are

12 excluded under the Plan from consideration for LTD benefits.

13 First, the Plan provides:

14     Any condition diagnosed as, or without regard to its
       designation is equivalent to, (1) attention deficit
15     disorder (ADD), or (2) chronic fatigue syndrome,
       Epstein-Barr Virus, or infectious mononucleosis shall
16     be disregarded in determination of Total Disability
       . . . .

17

18 Def's Ex. E at HP00355.  The Plan also provides:

19     [I]n the case of a disability resulting from a nervous
       or mental disorder, the Member shall be considered
20     Totally Disabled only if he or she is confined to a
       hospital or other licensed long-term care facility for
21     the treatment of such disability or has been so
       confined for fourteen (14) or more consecutive days
22     during the preceding three (3) months.

23 Def's Ex. E at HP00356.  Under the Plan, an illness is

24 considered a nervous or mental disorder if:

25     1.  The illness has psychologic or behavioral
       manifestations or results in impairment of mental
26     functioning due to any causes including, but not

                                3

1      limited to, social, psychological, genetic, physical,
chemical or biological; and

2      2.  The illness has a primary diagnosis that either is
listed in the American Psychiatric Association's

3      Diagnostic and Statistical Manual of Mental Disorders,
Third Edition-Revised, or falls within diagnostic

4      codes 290 through 319 in the International
Classification of Diseases, 9th Revision.

5

6  Id.

7      The Plan's claims administrator, VPA, must make the

8  determination of Total Disability on the basis of "objective

9  medical evidence," which the Plan defines as "evidence

10  establishing facts or conditions as perceived without distortion

11  by personal feelings, prejudices or interpretations."  Def's Ex.

12  E at HP00355.  It is the member seeking benefits who is "solely

13  responsible for submitting the claim form and any other

14  information or evidence on which the Member intends the Claims

15  Administrator to consider in order to render a decision on the

16  claim."  Def's Ex. E at HP00375.

17      Where a claim for benefits is denied, the Plan provides

18  that the member is permitted to appeal the denial by submitting

19  a written request for review.  Def's Ex. E at HP00377.  With

20  respect to an appeal of a denial of benefits, the Organization

21  "is the named fiduciary which has the discretionary authority to

22  act with respect to any appeal from a denial of benefits.  The

23  Organization's discretionary authority includes the authority to

24  determine eligibility for benefits and to construe the terms of

25  the Plan."  Id.

26  ////

1    Upon appeal of a denial of benefits, the claims

2    administrator must "give the claimant (or the claimant's

3    representative) an opportunity to review pertinent documents

4    . . . in preparing a request for review."  Id.  The Plan

5    provides, however, that the claimant is "solely responsible for

6    submitting a written request for review of the claim and any

7    other information or evidence on which the Member intends the

8    Claims Administrator to consider in order to render a decision

9    on review."  Def's Ex. E at HP00377.  The claims administrator

10   may require the claimant to seek additional information or

11   evidence as it deems appropriate to its review.  Id.

12       The Plan provides that, absent special circumstances, a

13   request for review should be "act[ed] upon" "within sixty (60)

14   days after the receipt thereof," and "[i]n no event shall the

15   decision of the Claims Administrator be rendered more than one

16   hundred twenty (120) days after it receives the request for

17   review."  Def's Ex. E at HP00378.  The Plan further provides

18   that a claimant should receive written notice of a denial of the

19   appeal and the specific bases for denial.  It also provides,

20   however, that, absent written notice that additional time for

21   review is required, "within sixty (60) days of the date his or

22   her request for review is reached by the Claims Administrator,

23   the claim shall be deemed to have been denied on review."  Even

24   where a claimant is given notice that additional time is

25   required for review, the Plan provides that where the claimant

26   "does not receive written notice of the Claims Administrator's

5

decision with respect to his or her claim within one hundred twenty (120) days after the date the Claims Administrator receives the request for review, the claim shall be deemed to have been denied."  Def's Ex. E HP00379.

Should the claimant wish to file suit regarding the denial of benefits, the Plan provides that the claimant must first exhaust the so-called administrative remedies set forth in the Plan.  Def's Ex. E at HP00379.  The Plan also contains a time limitation for bringing suit.  It provides that "[N]o action at law or equity shall be brought to recover benefits under the Plan unless the action is commenced within four (4) years after the occurrence of the loss for which the claim is made."  Id. The Summary Plan Description provides plan members with information concerning the exhaustion requirement and the limitations for suit.  It reads: "No legal action may be taken until all the claim review procedures have been completed.  No legal action may be taken to gain benefits from the Plan after four years from when the disability occurred."  Def's Ex. E at HP00441.

## II.

### PROCEDURAL BACKGROUND

### A.   PLAINTIFF'S BENEFITS CLAIM

On August 19, 1996, plaintiff filed her initial claim for STD benefits under the Plan.  She described her disability as anemia, hysterectomy, and stress.  In the Physician's Certification of Disability, her doctor explained that

6

1  plaintiff's primary diagnosis was iron deficiency and anemia,

2  and listed "chronic immune deficiency fatigue syndrome" as a

3  secondary diagnosis.  Plaintiff was awarded short-term benefits.

4      On February 27, 1997, plaintiff filed a claim for long-term

5  disability benefits in which she listed a number of symptoms

6  including nausea, muscle and joint pain, stress, chronic

7  bronchitis, headaches, anxiety, depression, and panic attacks.

8  The VPA denied plaintiff's claim for LTD benefits by letter

9  dated May 14, 1997.  In the letter, Dee Goodenough, a VPA

10 employee with the title "Disability Benefit Specialist,"

11 addressed the limitations on disability claims based on mental

12 health issues and chronic fatigue syndrome.  She then asserted

13 that the objective medical records supported that plaintiff was

14 being treated for chronic fatigue syndrome, fibromyalgia,[2]

---

15    [2] Fibromyalgia has been recognized in this Circuit as a physical
rather than a mental disease.  Jordan v. Northrop Grumman Corp.

16 Welfare Benefit Plan, 370 F.3d 869 (9th Cir. 2004).  In Jordan, the
court held that:

17

18     This syndrome . .  has traditionally been used for an
ill-defined, poorly understood set of symptoms,
consisting of aching pain and stiffness in one or

19 several parts of the body.  As we have previously
explained, fibromyalgia's cause or causes are unknown,

20 there is no cure, and, of greatest importance to
disability law, its symptoms are entirely subjective.

21 There are no laboratory tests for the presence or
severity of fibromyalgia.  The 'consensus' construct of

22 fibromyalgia identifies the syndrome as associated with
generalized pain and multiple painful regions .... Sleep

23 disturbance, fatigue, and stiffness are the central
symptoms, though not all are present in all patients.

24 The only symptom that discriminates between it and other
syndromes and diseases is multiple tender spots, which

25 we have said were eighteen fixed locations on the body
that when pressed firmly cause the patient to flinch.

26 The diagnosis is now based on patient reports of a

1  depression, and chronic bronchitis, but did not support a

2  limitation in function due to these conditions.  Goodenough

3  concluded that, in her opinion, the objective medical evidence

4  in the file did not support any limitation in function due to

5  bronchitis.  She also stated that, as to the diagnosis of

6  fibromyalgia, the medical records contained no supporting data

7  that plaintiff's symptoms were the result of an organic

8  impairment.  Goodenough noted that plaintiff had a right to

9  request review, and informed plaintiff that she would receive a

10  written decision within 120 days of the date of her request for

11  review.  Goodenough also noted that if plaintiff did not receive

12  a written decision within 120 days, "the appeal can be

13  considered denied."  Def's Ex. E at HP00067.

14      In a letter dated June 10, 1997, plaintiff appealed the

15  denial of benefits, alleging that she was disabled due to

16  fibromyalgia, chronic fatigue syndrome, immune deficiency

17  syndrome, pulmonary problems, and depression.  She stated that

18  she was appealing on the basis that her fibromyalgia, pulmonary

19  problems, and immune deficiency syndrome were disabling.  Def's

20  Ex. E at HP00062-63.

21  _____

22      history of pain in five parts of the body, and patient
        reports of pain when at least 11 of 18 points cause pain
23      when palpated by the examiner's thumb.  Although . . .
        the syndrome [may not be] []either "progressive" []or
24      "crippling," the symptoms can be worse at some times
        than others. Objective tests are administered to rule
25      out other diseases, but do not establish the presence or
        absence of fibromyalgia.

26  Id. (omitting internal quotations and citations).

8

1      On July 1, 1997, copies of the Plan were sent to
2  plaintiff's attorney, along with most of plaintiff's medical
3  records.  VPA informed plaintiff's counsel that any additional
4  information plaintiff wished to submit should be submitted
5  within 30 days.  Def's Ex. E HP00005-6, 00061.  On July 24,
6  1997, plaintiff's attorneys requested additional time to acquire
7  additional medical documentation to support her appeal.  VPA
8  agreed to extend the appeal submission date another thirty days
9  to September 3, 1997.  VPA sent copies of additional medical
10 reports to plaintiff's counsel on August 11, 1997, and gave
11 plaintiff until September 8, 1997 to submit her information.  On
12 September 18, 1997, plaintiff's counsel sent VPA a copy of a
13 report from Dr. Agresti dated September 16, 1997, and stated
14 that an additional report would be forthcoming.  The following
15 day, in a telephone conversation with Lance Tomei of VPA,
16 plaintiff's counsel stated that it might take another month to
17 schedule plaintiff for a medical evaluation.  On October 3,
18 1997, plaintiff's counsel sent a letter to Tomei purporting to
19 "memorializ[e] our agreement that the appeal review . . . will
20 not conclude until such time as Ms. LaMantia has obtained a
21 report from an evaluator of her choice and submitted said
22 report."  Pl.'s Evidence in Oppo. to Def's Motion at 403.
23 Plaintiff's counsel wrote that he hoped to obtain the report in
24 two months.

25     Whether plaintiff's counsel continued seeking to
26 communicate with VPA over the next three years is in dispute.

1  In any event, it appears that the dialogue resumed in August of
2  2000.  At that time, VPA received a letter from plaintiff's
3  current counsel asking for a response to materials that
4  plaintiff's counsel had allegedly sent in 1999.  VPA responded
5  that they had not received the materials and asked for copies,
6  along with an explanation as to why there had been a delay
7  between October 1997 and 1999.  There is no record of any
8  explanation for the delay, but plaintiff's counsel did send
9  copies of the missing materials.

10      It was another year before VPA sent a letter to plaintiff's
11  counsel stating that her appeal was denied.  Claims Manager,
12  Janet Curry, asserted that plaintiff's medical file did not
13  support a conclusion that plaintiff could not work on the basis
14  of chronic bronchitis and fibromyalgia, but that the symptoms
15  alleged are "those of depression, chronic fatigue syndrome, and
16  Epstein Barr virus and in the absence of these symptoms, she
17  could return to her job at Hewlett-Packard Company."

18  **B.    PLAINTIFF BRINGS THIS FEDERAL ACTION**

19      Plaintiff filed suit on October 17, 2001.  On December 20,
20  2002, this court determined that the VPA improperly denied
21  plaintiff long term disability benefits.  The defendant appealed
22  and, on March 23, 2005, the Ninth Circuit reversed in part and
23  remanded. See LaMantia v. Voluntary Plan Administrators, Inc.,
24  401 F.3d 1114 (9th Cir. 2005).  The Circuit court held that, in
25  this case, the correct standard of review is that of abuse of
26  discretion, instead of the de novo standard applied by this

1  court.  Further, the Circuit explained that, subsequent to

2  issuance of this court's decision, the "treating physician

3  rule[3]," applied in this case, was rejected by the High Court and

4  is no longer good law.  See Black & Decker Disability Plan v.

5  Nord, 538 U.S. 822(2003).  Accordingly, this court now reviews

6  the parties' summary judgment motions consistent with the Ninth

7  Circuit's instructions.

8                              **III.**

9                            **STANDARDS**

10  **A.    SUMMARY JUDGMENT**

11       The purpose of summary judgment "is to isolate and dispose

12  of factually unsupported claims or defenses." Celotex v.

13  Catrett, 477 U.S. 317, 323-24(1986). To obtain summary judgment,

14  a party must demonstrate that no genuine issue of material fact

15  exists for trial, and that based on the undisputed facts he is

16  entitled to judgment as a matter of law. Id. at 322.

17       The moving party "bears the initial responsibility of

18  informing the district court of the basis for its motion, and

19  identifying those portions of 'the pleadings, depositions,

20  answers to interrogatories, and admissions on file, together

21  with the affidavits, if any' which it believes demonstrate the

22  absence of a genuine issue of material fact." Id. at 323.  The

23  _____

24      [3]  Under that rule, the opinions of a claimant's treating
     physicians were given special deference and could be disregarded
     only for clear and convincing reasons based on substantial evidence
25  in the record.  See Regula v. Delta Family-Care Disability
     Survivorship Plan, 266 F.3d 1130 (9th Cir. 2001), vacated, 539 U.S.
26  901 (2003).

court must draw all justifiable inferences in favor of the non-moving party. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991).

If the moving party meets its initial burden, then the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). However, "[i]f a moving party fails to carry its initial burden of production, the non-moving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir.2000).

**B.   REVIEW OF PLAN ADMINISTRATOR'S DECISION UNDER ERISA**

A district court reviews an ERISA plan benefits denial "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115(1989). Where a plan does give the administrator such discretionary authority, courts review a claim denial under an abuse of discretion standard.[4] LaMantia v. Voluntary Plan Administrators,

---

[4]   The Ninth Circuit has used the term "arbitrary and capricious" to describe this deferential standard of review. Taft v. Equitable Life Assur. Soc., 9 F.3d 1469(9th Cir. 1993)(citing Dytrt v. Mountain State Tel. & Tel. Co., 921 F.2d 889, 894 (9th Cir. 1990); Madden v. ITT Long Term Disability Plan, 914 F.2d 1279, 1284 (9th Cir. 1990), cert. denied, 498 U.S. 1087 (1991)).  The Circuit has explained that, because the court "employed review in those cases consistent with the strictures of the abuse of discretion standard, however, [the] use of a different term was 'a distinction without a difference.'" Id. at n.2 (quoting Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 572 n.3 (8th Cir. 1992))

12

1   Inc., 401 F.3d 1114 (9th Cir. 2005).  As the Ninth Circuit has

2   already determined, "[t]he circumstances of this case fall into

3   the . . . exception for when an abuse of discretion standard of

4   review will apply."[5]  Id. at 1123.  Accordingly, this court may

5   review only the evidence presented to the Plan trustees.  Id. at

6   1471.[6]

7       In assessing whether a claim administrator abused its

8   discretion, the court considers whether the claim denial was

9   unreasonable.  Clark v. Washington Teamsters Welfare Trust, 8

10  F.3d 1429, 1432 (9th Cir.1993).  ERISA plan administrators abuse

11  their discretion when they "construe provisions of the plan in a

12  way that conflicts with the plain language of the plan." Eley v.

13  Boeing Co., 945 F.2d 276, 278 (9th Cir.1991).  An abuse of

14  discretion will also be found if the administrator relies on

15  (citing Block v. Pitney Bowes Inc., 952 F.2d 1450, 1454 (D.C. Cir.
    1992)("The distinction, if any, between 'arbitrary and capricious
16  review' and review for 'abuse of discretion' is subtle.")).
        [5]   The LaMantia panel explained that the Plan does in fact give
17  VPA "'the discretionary power to construe the language of the Plan
    and make the decision on review,'" and that the VPA did actually
18  exercise that discretion.
        [6]   The defendant argues that evidence subject to this court's
19  review is limited to that before VPA pertaining to plaintiff's
    condition as of the end of the short-term disability ("STD") period
20  when VPA made its decision on her claim for LTD benefits ("LTD
    decision date").  In other words, it maintains that the court may
21  only review evidence before the VPA before May 14, 1997.  However,
    the decision being challenged and reviewed here is the final
22  decision made by the VPA after reviewing plaintiff's appeal of the
    May, 1997 denial.  As the Ninth Circuit explained, defendant "never
23  considered LaMantia's claim to be fully denied until August 24,
    2001, when a final decision on the merits was rendered."  LaMantia
24  at 1119.  That "final decision . . . analyz[ed] all the medical
    evidence VPA [received up to that date] and reaffirm[ed] its 1997
25  initial denial." Id. at 1123.  Accordingly, the court will review
    all of the evidence before the VPA as of the date of the final
26  decision.

                                13

1  clearly erroneous findings of fact in making benefit

2  determinations, <u>Taft v. Equitable Life Assur. Soc.</u>, 9 F.3d 1469,

3  1473 (9th Cir. 1993), or the decision is unsupported by

4  substantial evidence. <u>Johnson v. District 2 Marin Eng'rs.</u>

5  <u>Beneficial Ass'n.</u>, 857 F.2d 514, 516 (9th Cir. 1988).

6       When the discretionary authority is granted to an

7  administrator who is operating under a conflict of interest,

8  however, that conflict must be considered in determining whether

9  there is an abuse of discretion.  <u>Eley</u>, 945 F.2d at 278-79.  If

10  a conflict of interest is found, the "decision will be entitled

11  to some deference, but this deference will be lessened to the

12  degree necessary to neutralize any untoward influence resulting

13  from the conflict." <u>Doe v. Group Hospitalization & Medical</u>, 3

14  F.3d 80, 87 (4th Cir. 1993).  The courts have been less that

15  clear as to when a conflict actually arises and what the

16  correspondent heightened standard should be.  The Ninth Circuit

17  has instructed generally that the deference should be lessened

18  "when the administrator is not entirely impartial or objective,

19  and may have a vested interest in denying benefits." <u>Kunin v.</u>

20  <u>Benefit Trust Life Ins. Co.</u>, 910 F.2d 534, 536 (9th Cir. 1990).

21  The "lesser deference standard" should "only apply . . ,

22  however, if the . . . decision implicates a serious conflict

23  between the interests of the employer and the beneficiaries."

24  <u>Oster v. Barco of California Employees' Retirement Plan</u>, 869

25  F.2d 1215, 1217-18 (9th Cir. 1988); <u>Jordan v. Northrop Grumman</u>

26  <u>Corp. Welfare Benefit Plan</u>, 370 F.3d 869, 875 (9th Cir.

1   2004)("the standard of review changes with the existence of a

2   'serious' conflict only").  A conflict of interest can be

3   evidenced by a showing that the plan administrator acted in bad

4   faith. Jung v. FMC Corp., 755 F.2d 708 (9th Cir. 1985).

**IV.**

**ANALYSIS**

**A.   HEIGHTENED STANDARD OF REVIEW**

8        Before reaching the merits, I must address a threshold

9   issue concerning the applicable standard of review.  Plaintiff

10  contends that the court should apply a modified abuse of

11  discretion standard because the VPA allegedly operated under a

12  conflict of interest.[7]  I examine this contention below.

13       Plaintiff first asserts that a less deferential standard

14  should apply because defendant acted in bad faith when it failed

15  to render a timely decision of her appeal of the denial of long-

16  term disability benefits.  The Ninth Circuit has already

17  addressed this issue and foreclosed this argument.  The panel

18  determined that the delays in making a final determination on

19  plaintiff's appeal were not a result of defendant's bad faith

20  because it was plaintiff "who sought an extension of time which

---

[7]   The defendant asserts that the court need not examine whether a heightened abuse of discretion standard applies because the Ninth Circuit already made that determination.  I cannot agree.  There is nothing in the record suggesting that the Ninth Circuit considered whether a conflict of interest existed as to warrant a less deferential review or that the question was even before it. Rather, the scope of the Ninth Circuit's discussion of the standard of review was limited to explaining why the abuse of discretion and not a de novo standard applies.  Accordingly, this court not only can, but must, resolve the question before going any further.

1  caused the deadline to file documents to occur beyond the

2  deemed-denial date."   LaMantia at 1123.

3      Plaintiff next argues that defendant acted in bad faith

4  because the VPA arranged for her to be evaluated by more than

5  one doctor.  According to plaintiff, this demonstrates that the

6  VPA "acted more as an advocate for denial, than a fair and

7  impartial third party looking to make the right decision."  This

8  argument is unsupported by any legal authority and is less than

9  convincing.  Nothing in the record supports a finding that the

10  independent medical examinations were impermissible.

11      Finally, plaintiff asserts that there was a conflict of

12  interest because the Company, the Organization, the Plan and VPA

13  are all agents of each other.  Plaintiff attempts to show the

14  Organization exercised complete control over the VPA and that

15  the impartiality of the VPA is therefore questionable.  The

16  parties agree that the benefits are paid by the Organization out

17  of a trust fund.  Pl.'s SUF 5, 6.  The VPA is a third-party

18  claims administrator that receives and processes claims for

19  benefits and computes claim payments.  Id. at 14, 15.  The

20  Organization has discretionary authority with respect to any

21  appeal from a denial of benefits to determine eligibility for

22  benefits and to construe the terms of the plan.  Pl.'s SUF 8.

23  Here, plaintiff concedes that the final decision made on August

24  24, 2001, was made by Janet Curry, claims manager for VPA.

25  Pl.'s Oppo. to Def.'s Mot. at 5.

26  ////

1        From what the court can tell, it appears that the premise

2   of plaintiff's contention is that the defendant was self-

3   interested in reducing the amount of benefits it was required to

4   pay out.  The Ninth Circuit has rejected this argument.  In

5   <u>Oster v. Barco of California Employees' Retirement Plan</u>, 869

6   F.2d 1215, 1217-18 (9th Cir. 1988), the court explained that,

7   "[t]o some extent, a potential conflict of interest" inherently

8   exists in these types of benefit plans because "[a]ny action

9   that enhances the financial viability of the Plan tends to

10  reduce the potential contributions of the company."  According

11  to the <u>Oster</u> panel, "[a] contrary conclusion would mean that we

12  must always consider [administrators] of a defined benefit plan

13  as subject to a conflict of interest, which we are unwilling to

14  do." <u>Id.</u> at 1217-18.  The Circuit affirmed this position in

15  <u>Jordan v. Northrop Grumman Corp. Welfare Benefit Plan</u>, 370 F.3d

16  869 (9th Cir. 2004).  There, the court stated that, where an

17  "insurance policy is both issued and administered by the same

18  party, in order to establish a 'serious' conflict of interest

19  . . . 'the beneficiary has the burden to come forward with

20  material, probative evidence, beyond the mere fact of the

21  apparent conflict, tending to show that the fiduciary's self-

22  interest caused a breach of the administrator's fiduciary

23  obligations to the beneficiary.'" <u>Id.</u> at 875-76 (quoting

24  <u>Bendixen v. Standards Ins. Co.</u>, 185 F.3d 939, 943 (9th Cir.

25  1999)).

26  ////

1    Accordingly, plaintiff's contention that she "ha[d] a

2 financial interest in getting the money, while the plan ha[d] a

3 financial interest in keeping it, . . . cannot [alone] establish

4 [a] conflict of interest in the administrator, because it would

5 leave no cases in the class receiving deferential review . ."

6 Id. at 876.   Plaintiff fails to alert the court to other

7 circumstances which may constitute the types of serious

8 conflicts of interest recognized in this Circuit. See, e.g.,

9 Dytrt v. Mountain States Tel. & Tel. Co., 921 F.2d 889 (9th Cir.

10 1990).   The court will therefore not modify the abuse of

11 discretion standard.

12 **B.   DEFENDANT'S INITIAL DENIAL**

13    The parties agree that plaintiff, as an eligible California

14 employee, was entitled to receive state income disability

15 benefits for a 52 week period beginning in August of 1996.  See

16 Cal. Un. Ins. Code §§ 2601 et seq.  Plaintiff complains that VPA

17 wrongfully evaluated her eligibility for long-term disability

18 benefits as of May, 1997, at the end of the Plan's 39 week

19 short-term disability period, instead of August 1997, at the end

20 of the 52 week period.  According to her, it was "serious error"

21 for VPA to make a determination of total disability for the

22 purposes of long term benefits after 39 weeks of receiving short

23 term benefits, instead of 52 weeks, and that such error warrants

24 reversal of its decision.  Although plaintiff's argument is less

25 than clear, she appears to contend that defendant was required

26 to provide her with short-term disability benefits for the

18

1  entire 52-week period and was precluded from evaluating or

2  instituting long-term disability benefits before that period.

3  As I explain below, plaintiff's contention fails for various

4  reasons.

5       First, plaintiff's contention that defendant violated state

6  law when it evaluated her application for long-term disability

7  benefits at the end of the 39-week period is unpersuasive and

8  unsupported by any legal authority.  The defendant maintains

9  that state law requires only that the employer provide

10 California employees with benefits for the minimum of 52 weeks,

11 but that it does not restrict employers from meeting this

12 requirement by paying long-terms benefits during that time.

13 Specifically, defendant explains that, under state law,

14 employers may elect to assume administration and payment of the

15 additional California benefits through a voluntary plan, for a

16 fee paid to the State, and that HP has elected such a voluntary

17 plan, as described in Supplement C to the Plan.  Supp. Curry

18 Decl. ¶ 3.  Defendant asserts that HP has elected to fund and

19 administer the state disability benefits as a voluntary plan,

20 and claims are processed by VPA in accordance with the state

21 regulations and are paid through the HP payroll system at the

22 rate set by the state.  According to defendant, this simply

23 means that HP's California employees who qualify for short-term

24 disability benefits under the Plan are entitled to at least the

25 amount of benefits payable under the California state disability

26 plan, regardless of whether they meet the stricter definition of

Total Disability under the Plan for the period after the 39th week.  Thus, if a California employee does not meet the definition for LTD benefits after the 39th week, his or her benefits continue but are limited to the weekly state benefit set out the California Unemployment Insurance Code.  See Cal. Un. Ins. Code § 2655; Supp. Curry Decl. ¶4.  Plaintiff does not dispute defendant's contentions.  Further, she concedes that she was paid short-term disability benefits for the entire 52-week period.

In any event, plaintiff was in no way prejudiced by defendant's evaluation of her application at the end of the 39-week period rather than after 52 weeks.  There is no indication that any new documents were available at the end of the 52 week period that were not available at the end of the 39 week period. Therefore, any procedural error committed by defendant was harmless, since waiting an additional 13 weeks to assess plaintiff's status would have been inconsequential.

More importantly, VPA's initial assessment has no bearing on the larger issue now before the court, that is, whether or not VPA's ultimate denial of benefits was an abuse of discretion.  The final determination of her long-term application was not made until August of 2001, which included a review of plaintiff's medical reports from September 1997 to 1999.  Accordingly, the medical reports reviewed by VPA were not limited to those dated before May 1997, as claimed by plaintiff.

1   **C.     FUNCTIONAL LIMITATION TO ESTABLISH TOTAL DISABILITY**

2       I now examine defendant's contention that, notwithstanding

3   the cause of plaintiff's disability, it reasonably found that

4   she was not "functionally limited in any objectively measurable

5   degree" such that she could be found disabled from performing

6   any occupation consistent with her training and experience.

7       The Plan places the burden of proof in establishing "Total

8   Disability" on the member.  The Plan explicitly provides that

9   the member is "solely responsible for submitting the claim form

10  and any other information or evidence on which the Member

11  intends the Claims Administrator to consider in order to render

12  a decision on the claim." Plan § 7(b); Curry Decl. ¶ 9 and Ex.

13  E, HP00375.  Accordingly, plaintiff had to show that she was

14  "continuously unable to perform any occupation for which he or

15  she is or may become qualified by reason of his or her

16  education, training or experience." Plan § 2(q)(ii); Curry Decl.

17  ¶ 7 and Ex. E, HP00355.  Defendant maintains that, even assuming

18  that plaintiff's diagnoses of chronic bronchitis and

19  fibromyalgia were correct, the medical records before it did not

20  support plaintiff's contention that she was functionally limited

21  from working.  Accordingly, I review the record to determine the

22  reasonableness of defendant's conclusion that there was no

23  objective medical evidence to support a determination that

24  plaintiff was functionally disabled from performing any job as

25  defined by the Plan.

26

1    The record includes documentation from her treating

2  physicians, Dr. Agresti and Dr. Herman, both of whom wrote

3  letters in June of 1997 discussing her diagnoses of chronic

4  respiratory infections and fibromyalgia.  In her letter, Dr.

5  Agresti stated that "due to the persistence of her symptoms she

6  has been advised that she needs to be off work.  Her treatment

7  plan is for Intravenous gamma globin therapy, be off work until

8  symptoms diminish, in order that she may be able to tolerate a

9  work schedule." See Pl.'s Ex. 2 at 000103.  Dr. Herman stated

10  that "she remain off of work at this time until her symptoms are

11  under control . . ." Pl.'s Ex. 6 at 000126.

12    On July 3, 1997, Dr. Agresti again reported that "LaMantia

13  may not return to work . . . due to fibromylagia and immune

14  deficiency syndrome."  The report contains the additional

15  comment that she "[c]annot return to any type of work even

16  outside of Hewlett Packard."  Pl.'s Tr. 105.  Again in September

17  of 1997, Dr. Agresti wrote a letter stating that plaintiff's

18  "medical condition has affected her so that she has not been

19  able to attain her goals and have debilitated her to the point

20  that she cannot work."  Pl.'s Ex. 15 at 402.[8]

21    According to the defendant, this documentation was

22  insufficient to allow it to find that plaintiff was functionally

23  _____
    [8]  Plaintiff also points to a report written by Dr. Agresti on
24  August 23, 2002 concluding that "LaMantia is totally disabled from
    all forms of occupations for which she is reasonably qualified
    based on her education, training and experience, due to Chronic
25  bronchitis, Fibromyalgia, and Chronic Immune Deficiency."  Pl.'s
    Tr.  108h.  This report is outside of the administrative record and
26  cannot be considered by the court.

1  disabled from performing any job, as described by the Plan,

2  because the doctor's statements related to her functional

3  abilities were conclusory.  Defendant maintains that these

4  conclusions did not satisfy plaintiff's burden to produce

5  "objective medical evidence" of "Total Disability," and it was

6  prohibited, under the terms of the Plan, to treat these

7  conclusory statements as objective medical evidence of Total

8  Disability.  In addition to its contention that the only

9  evidence of her functional abilities consisted of conclusory

10 statements, it also presents three additional grounds to support

11 its ultimate decision.  First, it asserts that VPA contacted Dr.

12 Agresti to request specific information regarding plaintiff's

13 functional limitations due to any disability, but that Dr.

14 Agresti failed to respond.  Defendant presents evidence that on

15 November 27, 1996, it specifically requested that Dr. Agresti

16 define plaintiff's capabilities and specific restrictions.  The

17 evidence reflects that VPA wrote to Dr. Agresti requesting that

18 Dr. Agresti "please call . . . to discuss the importance of

19 defining Karen LaMantia's capabilities to help her in returning

20 to work."  Curry Decl. ¶ 20 and Ex. E, HP00263 (emphasis added).

21 This request included a copy of plaintiff's job description

22 along with a form to complete defining her "specific

23 restriction." Id., HP00264-00266.  There is nothing in the

24 record showing that Dr. Agresti ever replied to this request.

25 ////

26 ////

1    Defendant further points to physician reports which

2    disagree that plaintiff was disabled from doing any type of job

3    which she is qualified or may be qualified for, and which, on

4    the contrary, indicate the possibility of her ability to work.

5    In a Physician's Status Questionnaire signed on December 18,

6    1996, Dr. Agresti vaguely indicated that plaintiff's physical

7    restrictions are "activity as tolerated – rest."  Curry Decl.

8    ¶ 21 and Ex. E, HP00260.  Dr. Agresti made an identical comment

9    as to plaintiff's limitations on a March 3, 1997 note, id.,

10   HP00198, and again on April 7, 1997, answered the question about

11   plaintiff's functional limitations and/or restrictions on

12   activities of daily life with the following conclusion: "limited

13   to level she can tolerate depending on her pain and level of

14   fatigue." Id., HP00104.

15   Defendant also explains that, although Dr. Nagua, a UC

16   Davis rheumatologist hired by VPA to do an Independent Medical

17   Evaluation ("IME") in January 1997, noted that Ms. LaMantia was

18   limited in her physical abilities, VPA chose to reject that

19   statement because it was qualified and inconclusory.  The record

20   supports defendant's contention.  Dr. Naguwa stated that

21   "[t]hough the patient has had at least a 50% decrease in her

22   usual ability to function, there is insufficient data as to the

23   completeness of her evaluation to seek an organic cause for her

24   symptoms."  HP00233.  Dr. Naguwa also concluded that Ms.

25   LaMantia's "condition may be improved," and recommended a "more

26   precise definition of her condition." Id.

24

1    Defendant also contends that it was reasonable for it to

2   reject plaintiff's physicians' conclusory statements because the

3   record included evidence bringing the diagnoses of chronic

4   bronchitis and fibromyalgia, the conditions allegedly causing

5   her physical limitations, into doubt.  Dr. Neil Wood, a

6   rheumatologist who performed an IME on July 17, 1997, opined

7   that he did not believe that plaintiff had fibromyalgia as a

8   clinical entity and ultimately concluded that the diagnosis of

9   fibromyalgia was unwarranted.  Curry Decl. ¶ 34 and Ex. E,

10  HP00011; HP00047-HP00050.  Further, regarding the diagnosis of

11  chronic immune deficiency based on decreased levels of IGG and

12  DHEA, Dr. Wood opined that the clinical significance of the

13  "slight decrease in IGG" and "low S-DHEA" has never been

14  completely established.   Curry Decl. ¶ 2 and Ex. E, HP00048.

15  Similarly, in a report plaintiff's counsel provided to VPA

16  during the appeal of her claim, Dr. David Kneapler, a Board-

17  certified internist and rheumatologist, stated that "[t]he role

18  of her selective IG3 deficiency is still unclear, as, when that

19  is problematic, it usually causes recurrent infections, and her

20  clinical history has not been characterized by that." Curry

21  Decl. ¶ 2 and Ex. E., HP00019-HP00023.  According to defendant,

22  these reports reasonably cast doubt on plaintiff's conditions,

23  which consequently cast doubt on her functional limitations due

24  to these conditions.

25    The Ninth Circuit has recently reviewed questions similar

26  to the ones the court faces here.  In <u>Jordan v. Northrop Grumman</u>

1  Corp. Welfare Benefit Plan, 370 F.3d 869 (9th Cir. 2004), the

2  plaintiff challenged the denial of long-term disability benefits

3  based on fibromyalgia.  The defendant there denied the

4  application for benefits on the grounds that plaintiff did not

5  present objective evidence that the condition of fibromyalgia

6  rendered her "completely unable to engage in any occupation or

7  employment for which [she was] or [would] become qualified." Id.

8  at 872.  The evidence submitted by the plaintiff there included

9  a treating physician's statement that "patient can't function

10 even sedentary work at present because of flare up of her

11 fibromyalgia and intensity of pains." Id. at 873.  Another of

12 plaintiff's physicians submitted that "under her current state

13 of affairs, she is medically disabled from her job as a

14 secretary." Id. at 874.

15     In reviewing plaintiff's appeal of the district court's

16 disposition in favor of the defendant, the Ninth Circuit first

17 reiterated that courts "cannot substitute [their] judgment for

18 the administrator's. [They] can set aside the administrator's

19 discretionary determination only when it is arbitrary and

20 capricious." Id. at 875.  It explained that "a decision grounded

21 on any reasonable basis is not arbitrary or capricious, and that

22 in order to be subject to reversal, an administrator's factual

23 findings that a claimant is not totally disabled must be clearly

24 erroneous. Id. (internal quotations and citations omitted).

25     The Ninth Circuit determined that the denial of the

26 plaintiff's benefits was not unreasonable.  First, it concluded

1   that the evidence submitted by her physicians regarding her

2   physical work limitations were "nothing but their *ipse dixit* to

3   substantiate the claim." Id. at 877.  Although these doctors'

4   reports stated that she was unable to work due to her medical

5   condition, they never "explain[ed] why." Id. at 874.  The court

6   gave great weight to the fact that the defendant requested from

7   plaintiff's physicians objective evidence to support their

8   conclusory statements and that they failed to comply with this

9   request.  The court explained that "the failure of an employee's

10   physician to respond to inquiries by the plan administrator

11   undermine[s] evidence in the petitioner's favor." Id. at 878.

12   Accordingly, the court was "bound to treat [plaintiff's]

13   treating physicians' opinions that she was disabled by her

14   fibromyalgia as undermined, which is to say less reliable or

15   unreliable."  Id.  The court then evaluated the record

16   consisting of: (1) plaintiff's physicians' conclusory

17   statements, which did not explain why or for how long plaintiff

18   was unable to work, (2) the physicians' failure to respond to

19   defendant's specific request as the functional limitations,

20   which undermined their reliability, and (3) evidence from

21   defendant's independent physicians stating that plaintiff was

22   not physically limited from all work.  It then held that it

23   could not conclude that the defendant had acted unreasonably in

24   denying plaintiff long-term disability benefits.

25      Defendant contends that Jordan should guide this court's

26   decision as to its finding that plaintiff was functionally

1   limited from all employment.  I must agree.  As in <u>Jordan</u>,

2   plaintiff's physicians' statements concluded that her condition

3   precluded her from working, but never explained what objective

4   medical evidence supported those conclusions.[9]  Similarly,

5   defendant made a specific request to Dr. Agresti to provide it

6   with the specific information that was missing, and Dr. Agresti

7   failed to respond.  Following <u>Jordan</u>, it was reasonable for

8   defendant to render Dr. Agresti's conclusory statements less

9   reliable.  Finally, defendant also had before it medical

10  evidence casting the diagnoses of the alleged debilitating

11  conditions into question.  Finally, the terms of the Plan made

12  it clear that it was plaintiff's burden to produce objective

13  medical evidence of a Total Disability.  As in <u>Jordan</u>, given the

14  method of analysis mandated, this court cannot conclude that it

15  was unreasonable for defendant to deny her application for LTD

16  benefits on the basis that she failed to prove that she was

17  completely unable to work at any job for which she was or could

18  become qualified for.  Therefore, this court cannot disturb

19  defendant's conclusion and replace it with its own judgment,

20  _____

21          [9]  Plaintiff contends that defendant erred by not considering
    her continuing receipt of Social Security benefits for fibromyalgia
22  and chronic bronchitis because they are compelling evidence that
    she was entitled to LTD benefits.  When a court finds substantial
23  evidence in the administrator's decision lacking, the court may
    weigh a Social Security award in plaintiff's favor.  <u>Madden v. ITT</u>
24  <u>LTD Plan</u>, 914 F.2d 1279 (9th Cir. 1990); <u>Pierce v. American</u>
    <u>Waterworks Co.</u>, 683 F.Supp. 996, 1000 (W.D. Pa. 1988).
25          Here, however, given Dr. Kneapler's report, the court cannot
    find that there was no substantial evidence to support the
26  administrator's decision.  Thus, the prerequisite for weighing the
    Social Security award was lacking.

28

because under current doctrine, VPA was within its discretion to deny the claim. See also Bolling v. Eli Lilly & Co., 990 F.2d 1028, 1029-30 (8th Cir. 1993) ("The [administrator] did not abuse its discretion merely because there was evidence before it that would have supported an opposite decision."); Eley, 945 F.2d at 279 (no abuse of discretion to deny benefits despite expert evidence showing that a certain procedure was diagnostic and therefore was covered by the plan); Sandoval v. Aetna Life and Cas. Ins. Co., 967 F.2d 377 (10th Cir. 1992)(no abuse of discretion to deny benefits despite report by one doctor concluding that plaintiff was totally disabled).

## V.

### CONCLUSION

Defendant's motion for summary judgment is GRANTED and plaintiff's motion for summary judgment is DENIED.  If reopened on remand from the Circuit, the Clerk is directed to close the case.

IT IS SO ORDERED.

DATED: August 18, 2005.

/s/Lawrence K. Karlton
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT